We'll hear argument first this morning in Case 23-929, Velazquez v. Garland. Mr. Cedrone. Thank you, Mr. Chief Justice, and may it please the Court. The 60-day time period in the Voluntary Departure Statute works like any routine legal time period. When the last day falls on a weekend or holiday, the period continues to run until the next business day. Congress would have expected people to read the statute this way. In 1996, common law principles, case law, established rules and regulations, and years of consistent practice all pointed to that interpretation. If Congress had meant to deviate from that traditional understanding, it would have said so. Even the government now acknowledges that other deadlines in the same section of IRIRA follow the traditional rule in light of a long-standing immigration regulation defining the word day. So the only way to stop the government's interpretation is to believe that Congress used two different meanings of the word day in the same section of the same statute. There's simply no indication that Congress took that kind of split approach. The government's interpretation would also spell chaos for regulatory definitions and deadlines. In the government's view, even though Section 1001.1H provides a single definition for the word day, the immigration regulations actually use that term to mean different things throughout. And so the only way to tell which deadline follows which time calculation rule is to trace each deadline's history back through earlier and earlier versions of the Code and Code of Federal Regulations. Answering a question as simple as, does my deadline fall on Saturday or Monday, shouldn't depend on this kind of complex historical investigation, especially when deportation's on the line. The default rule for weekends and holidays exists precisely to avoid this kind of case-by-case guesswork. The government identifies no reason, and certainly no reason grounded in the text of the statute, to depart from that traditional rule. The Court should read Section 1229C like any other statute and follow the usual rule for weekends and holidays. I welcome the Court's questions. 1252A speaks in terms of a final removal order. Is there one involved in this case? There is, Your Honor, and I would make two points. First, as you point out, subsection A1 speaks in terms of judicial review of a final order of removal. That's exactly what we're seeking. If we win in this case, the final order of removal that binds our client will say one thing. If we lose, it will say another. And the second point is this Court has long recognized that BIA decisions on reopening and reconsideration are separate final orders that require a separate petition and are separately reviewable in the Courts of Appeals. It seems that you're saying that a collateral consequence to a ruling on this is a part of the final order. How is that? So the voluntary The order itself is not here, right? I disagree, Your Honor, in two respects. So one, as I just pointed out, the Court has consistently explained that a reconsideration or reopening decision is I thought we were talking about the 60, whether there are 60 days or 62 days to leave voluntarily. That's right, Your Honor. And the voluntary departure order at pages 42A and 43A of the petition appendix spell out the consequences if, on the one hand, our client files a timely motion to reopen or, on the other hand, if our client fails to depart the country or files an untimely motion, there are two alternate orders of removal waiting in the wings, one with harsh penalties, one without. And this timeliness determination directly affects which of those alternate orders of removal will take effect. You argue and just said that this is a very simple question. But a good part of your argument is taking regulatory provisions and applying them to the statute. You say that that is the appropriate prism through which to read the statute. The prism test doesn't sound very straightforward and clear to me. What you have in this case is everything pointing in the same direction. So start with the regulations. Section 1001.1 provides a definition of day that has governed since the creation of the provision passed. And the government even acknowledges now that other deadlines in the same section of IRIRA follow that definition. So somebody picking up the statute in 1996 would have read the statute in light of that definition. But it's not just the regulation. As we point out, that regulation codifies an earlier practice that's reflected in Civil Rule 6A, which this Court and the BIA have looked to. That rule itself codifies earlier decisions like this Court's decision in Street that recognized a general principle that when a power can be exercised up until a certain day, if that day is a Sunday or holiday, it can be exercised the next business day. And those decisions recognized and even encapsulated an even earlier common law principle. So somebody reading the statute in 1996 would have had no reason to deviate from all of those things pointing to the same interpretation. But your argument evolves, right? I mean, as I read your brief anyway, the Sunday provision was pretty clear early on. But then Saturday kind of crept in there somewhere along the way. And so usually we think of timing deadlines as not sort of flexible in that way. Two points, Your Honor. First, I would just return to the regulation and say that that definition, which was in place for years before the statute passed, encapsulated Saturday and that codified — Right. But we're talking about the statute, so — Right. And I think that regulation encapsulates an earlier principle that has not changed over time. So the way I would frame the principle generally is that there are certain days, you can call them — certain legally recognized days of rest. You can call them non-business days. You can use the Latin term dies non-euridicus. That principle recognizes that when a deadline or time period expires on one of those legally recognized days of rest, it carries over to the next day. But the days that are legally recognized days of rest can change over time. And so with respect to Saturday, of course, there was a change in the 20th century as Saturday came to be recognized as a day that's akin to Sunday, on par with Sunday. But the underlying principle — Counsel, why are you going so far? You don't need the common law. Common law provides a background for what Congress was doing when it passed this law, correct? Yes. And your answer is that when a word comes with old soil, you transport the old soil. That's right. All right. And the old soil here, even according to the government, was the day was defined according to the regulation. That's right. All right. Now the question is, do we follow the government's new argument that there's somehow a difference in how day is defined with respect to court obligations or — I don't know where they get the word substantive from — or substantive obligations, correct? That's right. But if I look at the old soil, why don't I look at the law itself, the INA law, and when Congress wanted to talk about calendar days, it used calendar day instead of the word day, correct? I'm looking at 8 U.S.C. 1228b3, which has to do with the attorney general not executing any order for expedited removal until 14 calendar days have passed, correct? I confess I'm not familiar with that particular provision, but our position generally is that Congress can deviate from this principle, and it — And something like this would be a clear deviation? I think it probably would be. All right. Now, am I — I want to go back to the jurisdictional question that Justice Thomas started with. The government didn't raise a jurisdictional — disjurisdictional point before the Tenth Circuit, did it? It did not. And it raised it in its petition for opposition, but you didn't reply to it till your reply, correct? That's correct. Has this percolated among other courts yet? I don't believe this particular issue — well, I should say this. I don't think it's really disputed that there's jurisdiction in this case. I agree, because after Mata, we said motions to reconsider have an independent jurisdictional basis, correct? That's right. So hard to think why anybody would think they didn't have jurisdiction. But if we were to accept the government's ruling, do you know what other consequences this would have? I think if you accept the government's view of jurisdiction in this case, it would be either a real sea change for immigration law, because it would mean that reopening and reconsideration decisions aren't separately reviewable, as this Court has consistently pointed out in Reyes-Mata, in Kuchana, against Holder, and other cases, or — What other — the government says this is a one-off case. I don't know whether we would have granted cert if we knew it was one-off to start with. That everybody else appeals the order to remove, but you didn't. So I guess my question is, assuming we rule the way the government wants us to, do we know fully the consequences of that? I think it would be a lot of make-weight arguments in the Courts of Appeals. The government doesn't dispute, nor could it, that Courts of Appeals have jurisdiction to review — Counsel, stop going to the substance. I'm trying to ask you a question. Given that this is a new issue before us, isn't the best way to deal with it is to let the Court below address what consequences there are to this jurisdictional issue? I agree. The Court doesn't need to weigh into the jurisdictional issue beyond recognizing that this case falls within 1252A1. I do think there would be confusion if the Court were to side with the government, because the government doesn't dispute that Courts of Appeals can review this exact issue. It just thinks you have to bundle it with other arguments. There's nothing in the text of the statute that requires it. I think, as I understood Justice Sotomayor, Mr. Cedrone, one of — what she was asking to talk about was what collateral consequences, errors, that the government might make in a reopening petition that's denied that would be unreviewable. I mean, one consequence here would be, say you were clearly within the 60 days, there was no doubt about it, and the government said you weren't. That would be unreviewable, I think, on the government's jurisdictional theory, because it wouldn't affect the order of — it wouldn't affect the removability of your client, even though it would impose a 10-year bar outside the country erroneously. Are there other such consequences like that that you can think of? I think there are all sorts of things that get decided in reopening or reconsideration decisions that are distinct from removability, but nevertheless go to the terms of your final order of removal. So people — Congress contemplated that people would seek reopening often years after a final order of removal because of changed factual circumstances or other things. And under subsection B-9, the statute contemplates that all of these things will get funneled into a proceeding in the court of appeals. And so to say that there's — that this should have been raised differently doesn't account for the fact that this is the proceeding in which these issues should be raised. Mr. Cedrone, can I ask you one question about jurisdiction, one question about the merits? On jurisdiction, Justice Sotomayor pointed out that this seems to be a one-off case. I just want to clarify with you — and the government can speak to this, too, if the answer is different — how often does it happen that someone like your client simply challenges the motion to reconsider and not the underlying order? Is this very unusual so that this jurisdictional question wouldn't really frequently arise? I confess that I don't have a sense of the balance of that, other than to say that, as I was just describing, motions to reopen often come up years after the final order of removal and may involve questions of changed factual circumstances or other things that entitle you to relief from removal. And so I think on the government's view, this case is a one-off, not in that the government is taking the position that this issue is never reviewable, just that you have to bundle it in your petition with some sort of challenge, however slight, to your removability to seize the court of jurisdiction. And I don't see any support for that in the statute. Okay, my question on the merits. Most of the time when we think about this, and as I understand the regulatory backdrop, when we're thinking about filing something, the reason why it is bumped over to, say, a Monday from a Saturday is that the court is closed. But could your client have departed on a Saturday? That strikes me as the difference here, that this isn't governing filing dates or something that you're doing. It's just saying that your authorization to be in the country expires at that 60-day mark. And it's not that the court was closed. Your client could have departed, right? That's true. I can't dispute the factual premise that often somebody can get on a plane or drive across the border on a Saturday. This principle is deeper than that, and there are several indications that this principle is not just about court closures or filings. I think the best evidence of that is to go, I'll start with the regulation and work outwards. So the regulatory definition of day in section 1001.1 says that definition of day, which builds in the traditional rule, applies to any action in immigration regulations. Even on the government's theory of how that deadline applies, that principle applies to things like getting married to maintain your visa status, regulatory deadlines for getting fingerprinted after you enter the country, regulatory deadlines for taking a citizenship test. So these are all things that are not filing, not court-related. Working outward from there, Rule 6A, as we've pointed out, also applies to any applicable statute and any court order. And so that, of course, covers things like filing in district court, but it also covers things, we give examples at page 18 of our reply brief, of injunctions that a court might enter imposing substantive obligations on a party. So say you're a defendant in a trade secret suit, you're found liable, the court might enter an order at the end of the case saying, defendant, you have 30 days to turn over the misappropriated property. Under Rule 6A, that 30-day deadline clearly follows the traditional rule. And then working even outward from there, we have examples like page 28 of our brief, cases like the Aetna case, applying this traditional principle to deadlines under ERISA, which binds private parties, private plans, requires them to take all sorts of actions vis-a-vis each other outside the context of litigation. And then this Court's decision in Street, which applied this principle to a statute that sets time limits on the President's authority to take action. As we explained in the brief, that statute in Street is parallel to this statute, Section 1229C, gives the Attorney General the authority to grant voluntary departure, and then places a time limit on it. The statute in Street worked similarly. The Court applied the traditional rule there. It should apply the traditional rule here. Just like this one. But, Counsel, you have an argument that there should be a rule that applies in all situations, and it just causes a lot of confusion if it's not uniform. I get that. But put all of that aside, can you think of any practical reason why Congress would have wanted to give a two-day extension when what's involved is something that can be done just as easily on a Saturday or a Sunday as a Monday? There were reasons for the rules about filing, because courts were closed. Some of the things that you mentioned are things that would be more difficult, perhaps, to accomplish on a weekend. Originally, perhaps, the rule for Sunday was based on religion. You might argue that it should be extended to Saturday if your counsel, if your client has a, if that is a holy day, a special day for your particular client. But I can't think of any practical reason why there should be a rule, a different rule for departing the country. Yeah. So I think there's two practical reasons, one more substantive and one more procedural. This traditional rule, in our view, stems from a general principle that there are certain legally set-aside days where, presumptively at least, the government can't ask people to do stuff. And so the persistence of this rule, even in the face of 24-7 e-filing, shows that this is a principle that's deeper than just impracticability. Well, I mean, that doesn't strike me as a practical reason. Why can't they say, you've got to get out of the country in 60 days? You can get out of the country just as easily on a Saturday or a Sunday as you can on a Monday. I'll mention just as an aside, some of the amicus briefs go into the fact that it may well be more difficult to travel on the weekends. But I guess putting that aside, the second practical reason, the procedural one, is that we're talking about deadlines with severe consequences. The question of how and when your deadline runs should be easily understood and easily calculated, especially when there are severe consequences. And on the government's view, you have to undertake a case-by-case determination for each deadline in the regulations and each deadline in the INA. Maybe I could give an example. So there's a 180-day deadline in the regulations, Section 1003.23, a 180-day for seeking relief from in absentia removal. That regulatory deadline doesn't cross-reference the statute. So you might think, if you pick up the regulation and pick up the definition, you know how it applies. Well, but then seeking relief, that's requiring you to file some sort of a document. That's true, although as my colloquy with Justice Barrett explained, there are other deadlines in the regulations, like things like getting married and getting fingerprinted. And the point is that on the government's view, even though that regulatory deadline is facially clear, you need to go to the INA and see if there's a statutory analog for that 180-day deadline. It turns out there is in Section 1229A. But even then, you're not done. On the government's view, now you have to construct a family tree for the statutory deadline and the regulatory deadline and see which one came first. Only then can you figure out if your deadline is on a Saturday or Monday. I may understand it. This is the argument for a uniform rule. It makes things simpler. So I get that. I get that. Yeah, and I think it's not only that it's simpler, but the INA is filled with provisions like this where the individual's activities are tied to the government's activities, correct? That's right. And here, Section 1302, going back to Justice Barrett's question in part, says that when someone's visiting the United States, if they're going to stay longer than 30 days, it says the provision states that noncitizens who remain in the U.S. for 30 days or longer must apply for registration and be fingerprinted before the expiration of such 30 days. So that's very clear, like our 60 days here. Under the government's theory, I don't know whether they can be fingerprinted by the government on Saturday or Sunday. We'd have to figure that out, correct? Right. We'd have to figure out whether the agency is open for them to register on Saturday and Sunday, correct? Right. So these are the practical difficulties. With respect to the issue here, yes, there is an obligation on the alien to depart, but there's also a responsibility tied to the motion to reopen, correct? Which is a court activity. That's exactly right. So it's not simply an obligation that's tied only to the individual. If the individual does something, then the government has an obligation to dismiss their order of removal and give them additional time, correct? That's right. And I think it's telling that the regulations tie this departure deadline to a filing deadline. It shows that in the government's view, at least before, these things maybe aren't that different at all. But the confusion, as your questioning highlights, there are hundreds of instances of the word day in Title VIII of the Code of Federal Regulations and dozens, if not a couple hundred, of instances in the INA. And the government's view that for each of those, not only that the statute and regulations require somebody for each of those to undertake this intricate analysis of statutory and legislative history, it just doesn't make sense. I mean, it's hard enough for lawyers to figure out in an individual case, in an individual deadline, under the government's view, is it Saturday or Monday? The idea that pro se, non-citizen, do you know? Do you seriously think that there are people in the position of your client who rely on this? Well, this is really important for me to get out of the country or withdraw my acquiescence and voluntary departure within 60 days. But while I read this, so I've got another two days. I mean, seriously? Seriously. And let me make three points. So, first, there are plenty of immigration organizations that provide guidance to non-citizens about how deadlines apply. Secondly, that accords with the — I mean, if you were providing advice, would you say, well, okay, you know, you got the extra two days? Would you? I mean, if the government's position is adopted in this case, certainly not. But I think in the absence of that, everything points — Well, without, you know, the way things are, at the time when this came into play, would you say, well, you got the extra two days? Yes, I would. And let me make two other points. One is that for a non-citizen in immigration proceedings, even on the government's view, basically every deadline up until this final order follows the traditional rule. So if you're a non-citizen going through immigration proceedings, you know, my brief is due on a Saturday, that means it's due on a Monday. I need to file an appeal on a Saturday, that means it's due on a Monday. It's only this very last deadline that follows a different rule. So I do think that would be a trap for the unwary. And the last point I would make is that, yes, I think when you have everything consistently pointing in the same way, not just in the law, but the D.C. Circuit made this point in Sherwood, this rule is not just a lawyerly contrivance, it's also meant to capture the way that things work out in the world, in business, in society. And so just one concrete example, the motion that was filed in this case was sent by FedEx priority overnight, on a Friday. That means it gets there Monday morning. And I'm not suggesting that anything in our case turns on the vagaries of FedEx's shipping policies, it's just to say that even in business, overnight on a Friday sometimes means Monday. This is a principle that applies across the board. Do you know whether the government, in fact, applies this rollover rule to anything that's not a filing deadline? I mean, you mentioned fingerprinting, you mentioned marriage, but what is the government's policy as to anything that's not a filing deadline? I think the AILA amicus brief gets into this most clearly. It provides examples of immigration judges applying this day in and day out. I think most of the examples we've collected are actually in the voluntary departure context, but I think there are other examples in that brief as well of situations where this applies. And I should point out, this is, in the voluntary departure context, for example, it's a 60-day statutory ceiling. So an immigration judge in an individual case could, for example, set the deadline earlier or set the deadline on a date certain. This is just about the rule that applies, absent another indication. Thank you, counsel. Justice Thomas, anything further? Justice Alito? Justice Gorsuch? Justice Kavanaugh? Justice Barrett? Justice Jackson? Can I just ask, so it's a trap for the unwary because the filing of the motion triggers the extension. Is that right? In our view, the departure deadline and the motion deadline move together. So it's the 60-day voluntary departure deadline? Yeah. On the government's view, operates differently than every other deadline? Yeah, no, I understand that, but I guess I was trying to, I hear Justice Alito raising the point that if a person is told they have 60 days to get out of the country, when we're getting to day 58, 59, or whatever, they should be ready to go. And so are they getting two extra days or, like, what is happening? And I guess your response is that the way that the rules operate, if that person files a motion, that motion then needs to be resolved by the court and the person can stay until that happens. So what's really the trap is that ordinarily when you file a motion, you get to the following Monday if the deadline is over the weekend, and that's the way it works in every other scenario, and yet here you'd be filing the motion and it wouldn't. That's exactly right. I think that captures it, and that's what happened to our client in this case, with quite severe consequences if the government's view is adopted. Thank you. Thank you, counsel. Mr. Yang. Mr. Chief Justice, and may it please the Court, Section 1229C's maximum 60-day period for voluntary departure is not extended when the last day falls on a weekend or a holiday. The requirement to arrange for travel and to depart the United States involves primary conduct in the real world. Nothing prevents departure on weekends or holidays, when many prefer to travel. And unlike contexts involving the timing of litigation-based or administrative acts before courts or agencies, no tradition, by rule or otherwise, potentially exists for extending statutory deadlines for primary conduct. But first, statutory jurisdiction is lacking in the highly atypical posture here. Section 1252A1 grants jurisdiction to review final orders of removal, but in Petitioner's case, it does not involve review of a final order of removal, it does not affect the validity of a final order of removal, and it does not even affect how you would implement a final order of removal. Moreover, Petitioner has other avenues for judicial review of the timing issue here. He could seek APA review after unsuccessfully seeking DHS to return his voluntary departure bond or to adjust his status in the country. Now, on the merits, Section 1229C's test reflects the default rule that the 60-day statutory minimum means what it says. And neither common law tradition nor the definition of day for certain regulations supports a contextual exception here in the context of primary conduct. Similarly, there are other statutes governing similar primary conduct. The 90-day period to depart after entering the United States through the Visa Waiver Program or on a K Visa to marry does not allow days of 93 days. The 29-day statutory period for a ship crewman to temporarily land does not extend to 32 days. And Petitioner identifies no examples of extending statutory periods for engaging in such primary conduct. Now, the question whether Section 1229CD's penalties apply for failing to depart timely is a distinct question. Those sanctions apply only if this noncitizen voluntarily fails to depart timely. But Petitioner has not argued that departure was not nonvoluntary or was nonvoluntary and the 60-day period itself cannot be extended. I welcome the Court's questions. Mr. Yang, did you raise the jurisdictional issue below? We raised a different one, not this one. We raised this issue in our op. It will be abbreviated form, but we did, in our op. Petitioner argues that this is in fact non-jurisdictional and that you waived it. Would you respond to that? Yes. This is jurisdictional. Section 1252A1 provides for a review of a final order of removal. And that's the jurisdictional provision because it applies the Hobbs Act. The Hobbs Act provision, the jurisdictional provision of the Hobbs Act is Section 2342. It provides review in the Court of Appeals of seven distinct types of orders, but not orders in the immigration context, only orders from other agencies. So the way, as MATA recognizes, the way that there is jurisdiction here is 1252A1 grants jurisdiction to review final orders of removal and then just plugs that into the Hobbs Act. And when you say final order of removal, what do you think that encompasses? Yeah, I think there's a few things. And this is, after the Court's decision in Nasrallah, it is the following. It is the final order of removal itself. Now, what does that mean, the final order of removal itself? Is it just the determination that somebody ought to be removed, or is it everything else that appears in the final order? Not the latter. We made that argument. It was rejected in Nasrallah. Nasrallah says the final order of removal either finds the citizen deportable or orders deportation. That's it. But it also says anything that affects the validity of the final order. That's why there's – that's only the first category of things. There are issues that affect – If I might just finish.  Thank you. Yeah. So one provision in this particular final order is that you're going to be barred for 10 years from seeking reentry into the country if you don't voluntarily remove yourself within 60 days. That's actually written in the final order, and where this litigation tests the validity of that, doesn't it? No. Okay. And I'll explain why.  This is really important. Pages 42A – I agree with that. 42A and 43A of the appendix are what Petitioner relies upon. That is the tail end of the BIA's decision on the appeal. Not reconsideration and not reopening. It says two orders. Order. Appeal dismissed. Order voluntary departure. Then it has – these are in bold, you know, all caps. I've read it. It says warning. But it says notice. It says notice if you fail to voluntarily depart, there are civil penalties and you're ineligible. Yeah. And that's – nothing's going to change with that. That's true. If you fail to voluntarily depart, that's – those are – there are sanctions. But the order operates entirely differently under your view versus under Mr. Cedrone's view. One might say the order operates entirely differently depending on whether one takes the view of the original immigration judge or the later view of the board. I mean, this makes the order into a different order with different consequences. It does not change the order. The order – the bottom line of the order and the only thing that these orders ultimately require here that wouldn't allow for judicial review later is this alien noncitizen is deportable and shall be removed. That's it. Period. There are collateral consequences, but as I noted in my intro, those collateral consequences can be challenged separately. For instance, on every noncitizen who's granted voluntary departure, they must post a monetary bond. We keep the bond. If they want the bond back, they simply say, I want my bond back. DHS will adjudicate. Here DHS has already said, you violated your – this is in footnote four of our brief – you violated the voluntary departure period, therefore we're keeping your bond. He could challenge that before the agency's administrative process and then seek APA review. He could, while he's in the country, for instance, seek to adjust status with DHS. DHS would probably say, can't adjust status, you're barred. Then you get judicial review of that through normal APA review. What's happening here is a jurisdictional revision that is designed to review only final orders of removal is being used to review something that has nothing to do with final order of removal. But Mr. Yang, Mr. Yang, you, in making that argument, seem to be relying on Nasrallah and suggesting that only orders that relate to the removability qualify as affecting the validity. Am I wrong about that? I haven't quite finished the categories of things that were captured. There's the final order of removal. As Nasrallah explains, there are things that affect its validity, which can merge into the final order. In addition, you can raise issues together with the final order of removal. And there's another category which we think is included. Review of a final order should include rulings that affect how to implement the final order. Oh, there we go. Right? How to implement the final order. There we go. Yeah. How are you going to implement this final order? Is the fellow barred from the country for 10 years or not? That's not in the final order. It actually does say warning, but at any rate. Thank you. It says all that simply does, the final order says several warnings. I mean, where do you get all this from 1252? I mean, I thought you were a good textualist, Mr. Yang. Well, when I start with you. It says that we have authority, the Court of Appeals has authority to review final orders of removal. That's it. That's what it says. That's true. And it says that judicial review of all other questions, this is a zipper clause in B-9, are available only in judicial review of the final, of a final order under this section. All right. If it's so obvious, how come you didn't raise it below? That I can't speak to. All right. Oh, neither can I. I guess. Can we hold it? But this is jurisdictional. It's not something that we. Is it? I mean, jurisdictional is just, Justice Ginsburg used to love to say is a word of many, too many meanings. This is the big J jurisdictional meaning. This is because 1252A1 only grants jurisdiction through the Hobbs Act to review final orders of removal. And we think you can expand that a little bit, but the case has nothing to do with the final order of removal. It is not the final order. It does not affect its validity. All right. Mr. Yang, not only did you not raise it, I thought you affirmatively represented to the Tenth Circuit that there was jurisdiction in this case. No. We said there wasn't, but for a different reason. You said there wasn't, but for not, not for this reason. Statutory prohibition. All right. So what do you do about the fact that Nasrallah itself recognized that evidentiary rulings merge into final orders? Most evidentiary rulings are going to be collateral in the sense that you're talking about. So why is it that this is not? No, because evidentiary ruling that's, I mean, if it were, if the judge admitted something and then said, well, this is completely irrelevant, has nothing to do with anything, maybe that would be the case. Well, this is not completely irrelevant. I mean, this, as Justice Gorsuch keeps emphasizing, has to impose serious consequences on the defendant. So what I'm saying is an evidentiary ruling that doesn't go to directly whether or not a person is removable under Nasrallah counts, because it's still a part of the final order for the purpose of reviewability. The final order here is an order of removal. It orders Grant's voluntary departure. The only collateral consequences that arise arise from the decision on reopening and then reconsideration. But Petitioner's not even seeking to challenge the reopening decision. So would it matter if he had? Yes, because a reopening decision, if, now you can't make a frivolous claim. I mean, Bell v. Hood and Steele Co. makes clear there's no jurisdiction over frivolous claims. But if you have a good faith claim that you're challenging the motion to reopen, you're moving to reopen and that itself will affect either the validity of the final order or it could affect how the final order is implemented. So what if he had done that here and not just, not just appealed his motion? We wouldn't be making the jurisdictional argument because he would have been arguing that it should have been reopened, one, because I provided sufficient new evidence as required and I'm not barred. And both of those arguments would be teed up. Could he have challenged the collateral consequences as Justice Gorsuch was talking about through a motion to reopen? Is that the government's position? No. No. Okay. The collateral consequences come up later, right? It comes up when you are denied a benefit or when you don't get your bond. And he can challenge those in those contexts in the country. So you can challenge even things that are not having to do with your categories that you just gave me, so long as you have another challenge that does? Yeah. It's a normal APA challenge, not a challenge to a final order of removal. Because it would be a DHS decision. So if he had brought this NIS-Perez challenge, he could have also challenged this determination on the 10 years, even though it doesn't fall, in your view, into any of your, any of the  No, it would because what he would have taught your view is I only have jurisdiction to do things that have to do with removability and this isn't one of them. No, it would. When he challenged, if he had challenged the motion to reopen by saying the proceeding should have reopened, be reopened, which then has the potential to affect the final order Yeah, but in that litigation, a court might say your NIS-Perez argument is no good. Sure. But you don't have to wait 10 years. Sure, but the fact And I have jurisdiction to do that. The fact that you lose, might lose, doesn't mean there's not jurisdiction to, you know, to seek review. Let me ask you another question on the merits, if I might, and then I'll, I'll, I'll let you go. Sure. I promise. Well, maybe not. I'm happy to be here as long as you'd like to keep me. I take the common law point that it usually has to do with court deadlines, but your regulation is clear. It says all, any. And you've had this regulation for a very long time. And normally the government really likes its regulations. It used to come up here and say, we have to defer to them. Now it comes up here and says we should give them great respect when they're contemporaneous and longstanding, which check both those boxes here, right? So you're, you're running from your regulations. I mean, it's sort of like garlic in front of a vampire. You don't want to have anything to do with them. Well, I don't know that that's quite right. The regulation at issue here is not a general definition of day throughout the immigration context. It is limited in textually in two specific ways. One, it only applies only to regulations, not statutes. Secondly, it applies only when the period of action is provided in the regulation. And we don't think that applies. Section 1229C is a statutory provision. So 1221A, or 1221, sorry, Section 1.1 would not apply. No regulatory antecedent to which 1.1 would have applied exists. And the implementing regulations, and this is on page 8A of the appendix to our brief, say that the maximum is 60 days as set forth in Section 240B of the Act. It's not saying that the maximum is set forth in the regulations. It's saying that the Act is what sets forth the maximum. Counsel, you began your argument by emphasizing the distinction between this type of deadline and general court deadlines. I don't quite understand that. I mean, this is a deadline for the courts as well. The courts can't exercise jurisdiction if the, you know, if the, depending upon how we rule. I don't know how that's any different than our deadline for filing a cert petition. I mean, it affects what, you know, outside conduct, but it also binds the court. I don't, it's true that it can have legal consequences, but when I make the distinction between primary conduct in the real world and things that are concerning actions in litigation, things like filing deadlines or other things that are, that's what I'm talking about. That's where, you know, we disagree. So I completely understand the rationale for that, but that appears no place in any statute or in any regulation that you're talking to. So that's, I mean, I mean, that would be an entirely atextual limit on this regulation in particular. I don't, I don't think so because the general rule, the default rule is the text and the text we think is clear. The question is whether to seek a contextual exception from the text. And our point is the exceptions, if they apply, only apply in these other contexts, not conducts, contexts involving primary conduct. I guess I don't understand this. I thought that we had been talking about a general regulation that has a rollover principle in it and that says that's the way the agency is going to understand what the word day means in this, you know, when it confronts 60 day periods or 30 day periods or what have you. And the argument that you are making sort of filing deadlines versus everything else or things that are about primary conduct versus things that are primarily about court conduct, that just doesn't appear in the agency's own regulation respecting this issue. That's true. The regulation though is itself limited only to one, regulations that use the word day and two, only those that set the time to take action itself, not statutory times to take action. So if you're looking for an exception, it doesn't lie there. That's our point. And the statute says this period shall not exceed 60 days. That's 60 days. I mean, Sunday is a day, Saturday is a day. Can I ask you, the period for departure may not exceed 60 days, but where is the authority that says that if you file a motion for reopening or whatnot, you can stay until that motion is decided? Oh, no, that's not necessarily the case. So what happens is, this all follows from DADA in 2008 and the regulations that were enacted in response to DADA. If you file a motion to reopen or a motion to reconsider before the voluntary departure period ends, it withdraws your request for voluntary departure. What happens then is you are immediately subject to an order of deportation and we could remove you from the country like that. I see. So I guess my question is, why isn't this then also implicating the courts? Several of my colleagues have sort of raised this. I mean, if your filing of a particular motion has the consequence of affecting a withdrawal and therefore starting the process of actual removal, why wouldn't the deadlines that apply to filing motions or the regulations that apply to filing motions be implicated? Because the voluntary departure deadline exists regardless whether any filing is made. That's the case of anything. No, no, no, no, no, no, no, no, no, that's not. Because Congress says your time to voluntary depart is 60 days, period. If you do nothing, you've got to voluntarily depart in 60 days. There's no filing. And the filing deadline for a motion to reopen is 90 days. It's timely if it's filed. This motion to reopen was timely. It was within the 90 days. The voluntary departure deadline is a separate one governing primary conduct. The fact that the petitioner wanted to get it in, his motion in before that separate deadline expired, doesn't convert that separate deadline into a filing deadline. Can I take you back to the jurisdictional question and make sure that I understand your answer? If this petitioner had wanted to challenge the view of timeliness reflected in the denial of the motion to reopen, how would he have done that? He should have taken that straight to court, you're saying? Well, he could have done it in multiple ways. He could have, if he wanted to do it in the context of the removal proceedings, not going to the collateral consequences, because remember, he could challenge the withholding of the bond, or he could now move DHS to adjust status and when denied because he didn't  This is a really simple question having to do with this petitioner who has just found out that with very severe consequences, his understanding of what counts as timely conduct is wrong. And how does he challenge that determination? So if he could challenge the motion to reopen on judicial review, he could have sought reconsideration and then challenged both the motion to reopen and the motion for reconsideration. Okay, so let's stop there. He could challenge it in court is the first thing. And then you said the second thing is he could challenge it as long as he included a challenge to his removability. That was the second thing. And I guess what I want to say is, I mean, this strikes me as a very strange rule that you're precluding him from doing what actually seems, from the agency's own perspective, the sensible thing. In other words, he's seeking exhaustion of administrative remedies. Before he goes to court, he wants to make sure that the agency itself has thought about this question sufficiently. And then you say, well, he has to attach it to a challenge about removability. But he's saying he doesn't have a challenge about removability. So you're asking him to make up a completely meritless claim in order to get jurisdiction. And how do either one of those things make sense? This is a man who's really trying to get the agency to focus on this timeliness determination that has just arisen in the denial of his motion to reopen. He did what I would think the agency would want him to do. Well, I will say that where this comes from is the text. That is, there's review only of a final order of removal. That's 1252A1. It then goes to Nasrallah, which interpreted final order of removal. Now, our argument in Nasrallah. That's completely non-responsive to the question that I just asked. Our position is following the text in this court's position. Let me ask you about the text then. Is this a question of law, in fact, arising from any action taken or proceeding brought to remove an alien from the United States? It is. And the latter part of that provision, if you continue reading. So what I'm reading is 1252B9, otherwise known as the zipper clause. And this clearly fits into that. It is a question of law, in fact, arising from an action taken or proceeding brought to remove an alien. And then it says, any of those questions shall be available only in judicial review of a final order under this section. Now, wouldn't you read that to say that all those other questions that fall into that first part of the provision are, in fact, reviewable. Not if there's not a final order. If there's not review of the final order of removal, it doesn't fall within that cap. That's what the text says. It's available only in judicial review of a final order. But didn't we get it not if judicial review of a final order is understood to include all of those questions? That was rejected by this court in Nasrallah. We argued that a final order included- But Nasrallah was not- No, no. We argued that all rulings in the removal proceeding, under the zipper clause, that kind of thing goes into a final order. The court rejected that. They said, no, no, no. That was under the FOTI framework. That all changed. Now, we're going to apply the definition in the INA. That definition means a final order of removal either finds a non-citizen deportable or orders deportation. There's another category, things that affect the validity of that. Mr. Yang, you keep skipping over MATA, and that's what I don't understand. You keep going to Nasrallah, but in MATA, I thought the court made clear that the INA's grant of jurisdiction over final orders of removal encompasses review of decisions refusing to reopen or reconsider such orders. Here we have a decision refusing to reconsider or reopen. Nasrallah did not involve a decision refusing to reconsider or reopen. So why doesn't MATA's determination that those kinds of decisions actually do- Because MATA recognizes that reopening and reconsideration can be subject to review. It doesn't say everything. So for instance, take an alien who's a soccer fan and says, I move for reconsideration. I want you to include in your opinion the statement, I'm as good of a soccer player as Lionel Messi. I don't think you should trivialize this case. No, this is actually- No, no, no, no, no, because it doesn't affect the final order of removal. But Mr. Heng, MATA says that there are certain categories of orders, those that go to reopening and reconsideration, that do count as final orders of removal. That seems to me to be a simple, clear line that judges can apply when we determine whether or not we have jurisdiction, and it's one that makes sense. You want us to drill down. Only certain orders of reopening or reconsideration count. It's hard to avoid the final order of removal language, because that's where the only jurisdictional - I'm not avoiding it. I'm saying MATA interpreted it. MATA interpreted final orders of removal to, quote, encompass review of decisions refusing to reopen or reconsider such orders. And we have such a decision in this case. What I hear you saying is, yes, but only certain decisions that refuse to reopen or reconsider count. And you want us to look at the extent to which the person in their application made certain arguments. It seems like a very technical way to go about this. When we have a case that already interprets motions or decisions that encompass review of refusing to reopen or reconsider as final orders of removal for this purpose. MATA did not say that every motion to reopen and every motion to reconsider, regardless of what it concerns, is subject to the jurisdictional provision. And our point is- But why wouldn't it be? Why wouldn't it be? We are talking about the power of the court to hear a person's claim. We're not saying whether or not his claim is meritorious, whether or not- Why wouldn't the rule that makes sense, that Congress intended when it was talking about jurisdiction be that the final order of removal and any subsequent attempts to get the court to revisit or get the agency to revisit through a motion for reopening or a motion for reconsideration all fits in the umbrella of things that the court would review. Because when the issue concerns a matter as collateral as this, and in addition- It's not collateral because it relates to the final order of removal in the way that MATA indicated. And in addition, where you have judicial review elsewhere, Congress would have thought that those collateral consequences could be pursued, but in a different judicial form, in a different way. It's not unusual here. We're talking about removal proceedings where it doesn't affect the order of removal in any way. It really doesn't. This is all collateral. This order of removal is unchanged. There's not a word on that page in, what is it, 42 and 43A that would change. Nothing. They say it would change, but how are you going to change it? Notice, if you fail to voluntarily depart, the following will happen. That's right. Nothing's changing there. The only collateral consequences arise from the subsequent- Well, but the meaning of that provision has changed. And that provision is in the overall order of removal. You're insisting on saying that the order of removal is just the conclusion as to removability. But in fact, it makes reference to other matters, including voluntary departure. And the meaning of the voluntary departure provision, how it's implemented, how it operates on the ground, completely changes depending on whose view of timeliness one adopts. The order doesn't change. It's no different than a sentence, a criminal sentence. If this criminal sentence says, we're going to impose supervised release, and if you commit a federal crime while on supervised release, it's a violation. That judgment doesn't say you've committed another federal crime. You've got to wait for a separate order about whether or not you violated the terms of supervised release. That's the same here. This is simply saying, if the following happens, these are consequences, the separate order that really addresses whether they happened is the motion to reopen, which they're not challenging, and a motion for reconsideration, which they are. And that's the only thing they're challenging, and it doesn't affect the final order of removal. I think it's also important to just note the consequences or the penalty that's imposed by CD of a monetary sanction or ineligibility for certain relief, like cancellation and adjustment of status, only applies if the noncitizen voluntarily fails to depart in the time period specified. And the board has interpreted that provision in a case called Simijuska. It's 21 INN Decision 89. And the court, the board said, you do not voluntarily fail to depart if, through no fault of your own, you're unaware of the grant of voluntary departure or you're physically unable to depart. So my point by this discursion is to explain that whether or not the noncitizen is subject to these penalties is a separate inquiry. If, for instance... Mr. Yang, can I just interrupt and ask you a question? So you didn't make this argument in the Tenth Circuit. Have you, as the government, made this in any court? This is a very rare case, rarely arises, so we've not made it. And it's also an argument that builds from Nasrallah, which is very recent, too. So the combination of the two, this is the first time that we made it in this case, first in a very summary way, and now more thoroughly. This was not the question we granted cert on. Jurisdiction, you're saying? Correct. Jurisdiction. And if it were easy, then I can see just resolving it. But the question's revealed that maybe it's not so easy. In that circumstance, is the prudent thing to do to vacate and send it back so that the Tenth Circuit could consider the jurisdictional issue in the first instance? Justice Barrett's question hasn't really, and Justice Sotomayor's earlier, it hasn't really percolated this kind of jurisdictional question. So I'm just trying to figure out what's sensible for us to do. We would not object to that. We also, we think it's sufficiently clear ourselves, that's why we're making it. But if the court wants to, there's no harm in sending it back, you know, percolation... We don't want to make a mistake on something that is jurisdictional and could have ramifications that are unforeseen. And we don't object to that. Thank you, counsel. Thank you. Justice Thomas, anything further? Mr. Yang, you said that Nasrallah was one of the reasons we have this situation in this case now. Would you explain what you mean by that? So our position in Nasrallah was that all rulings in a removal proceeding were within the ambit of the term final order of removal, and we were doing that because there were exclusions of review of final orders of removal, and the court rejected that argument. The court said the term final order of removal in 1252 is something more limited, relying on the statutory definition. It is, one, things that find, rulings that find the noncitizen deportable or order deportation. That's it. Now, in addition, Nasrallah says that things that affect the validity of the final order will merge in the final order. And we would like to extend that to some other things, too. We think that if you raise an issue together with, under B-9, the zipper clause helps you because it says you can raise it in judicial review of a final order of removal, but you still have to have a final order of removal you're seeking review of. And we think things like withholding of removal where it affects how you implement the final order of removal, even though it doesn't affect the validity of the final order of removal, that's close enough because we need to know how to implement the final order that is part of judicial review of the final order of removal under the zipper clause. So those are the things that we think get covered, but all of them point back to some final order of removal, and the reason is is because the jurisdictional provision in 1252A1 only grants jurisdiction over review of a final order of removal. That's it. Justice Alito, anything further? Justice Sotomayor? I'd like to go to agency practice. Justice Gorsuch was right that most of the time the agency comes in to defend its practices. In this very case, the immigration judge told a petitioner that he had the extra two days. The summary of the March 5th oral ruling says respondent's application for voluntary departure was granted until May 6th. That's 62 days from March 5th. I understand from the amicus brief filed here that that was a consistent practice by immigration judges. I'm not sure that's correct, but I don't want to interrupt. But some did.  Okay. And it's finding precedent in the Ninth Circuit. And when did the agency correct that finally? Excuse me? When did the BIA issue an actual ruling that said they were wrong? Well, it hasn't yet. In 2007, the BIA's decision in Mesa-Vallejos, which is the Ninth Circuit precedential decision on the other side of the split, went the way we said. In 2007, the Ninth Circuit disagreed and agreed with the petitioner, although it's not quite the same position. But the bottom line is basically the same. Then in this case, we address it again. Fairly. Thank you, Ms. Cagan. Justice Kagan? Justice Gorsuch? Justice Kavanaugh? If we do address the jurisdictional issue, and if you lose on that, what collateral or additional consequences, negative from your perspective, could ensue, and what language would you want us to include in the opinion so that it does not have those kinds of ripple effects? Well, it's a little hard to know. It will depend on how the court writes the opinion. That's why I'm asking you what you think. Maybe this just reinforces my prior question that we shouldn't be doing this. But assume we are doing this, and assume you lose, then what I don't want to do is write an opinion that has all sorts of ripple effects that we haven't foreseen that you can tell us now, don't do that. Totally understand. So I think you would restate the Nasrallah. Start with Nasrallah, right? You can seek review of a final order of removal, that is, finds the citizen deportable or is deportation. Two, you can seek review of rulings that merge into the final order, and the reason they merge is because they affect the validity of the final order of removal. And I think you can also say that you can review things together with a final order of removal under the zipper clause, B9. But again, you still need to explain how there's a final order of removal being reviewed. And then you can go even further and say that rulings that affect how to implement the final order, even if it doesn't affect the validity of the final order, so for instance, can you move to this country, quintessential question about withholding or cat relief, right? How do you implement the final order? Those things could be reviewed in and of themselves because they're close enough to a final order. Now, after you said all that, because we don't want to carve out these ‑‑ those are like important categories. We came to the conclusion that, well, that's pretty generous, but there's still this category of things that just doesn't have a relevant relationship to a final order of removal here where you're seeking to change some language and opinion with collateral consequences. I'm not sure how you then square the circle and say, and that somehow fits in those categories, but you'd have to try to do that in some way, I think. Thank you. Justice Barrett? Justice Jackson? Would the ripple effects be just to allow courts to review challenges under circumstances that the government would prefer not to have to defend against? I mean, I don't understand. Justice Kavanaugh says, well, if you lose with respect to jurisdiction, I guess that means that courts would just decide certain kinds of questions that the government thinks the court should not be able to, right? I guess it depends on what the court says because we're not just talking about this case. Right. I'm just trying to understand the scope, the blast radius of you losing in this case, and it just seems to me that you'd be in a situation in which there would be certain kinds of arguments, like the one made here, about what you say is a collateral consequence that the court would consider under circumstances in which the government thinks the court should not be able to do so. Yeah, I think the consequences really will flow from how the court decides what judicial review of a final order of removal is in light of Nasrallah. Thank you. Thank you, counsel. Rebuttal, Mr. Cedrone? Thank you, Your Honor. Let me say a few words about jurisdiction and then a few words about the merits. On jurisdiction, the question of whether there's going to be a blast radius from this decision, the government explains at page 18 of its brief that it sees the jurisdictional question in this case as turning on two idiosyncratic features of this case. What the government has tried to do is construct a view of jurisdiction that disposes of this case and no other. For the reasons we've explained, that view of jurisdiction is wrong. The court doesn't have to do anything unprecedented to recognize as much. It can start with the text of the statute, which covers a final order of removal. On the government's view, a final order of removal is just the piece of the order that says you are removable to this country. I don't know where that comes from. There is the only thing that's unprecedented about jurisdiction in this case is the government's view, which appeared for the first time in the brief in opposition and has continued to evolve, including at the lectern here today. I heard Mr. Yang say for the first time that there's a voluntariness test that needs to be adjudicated, and he cited a BIA case that I don't believe was in his brief. The reason for that is this is a rule that's crafted to dispose of this case. The court doesn't have to do anything different from what it's already said in previous cases to recognize jurisdiction. I also heard Mr. Yang say on jurisdiction that jurisdiction is available in a case where the question turns on how the removal order is implemented. I don't know how to credibly explain to a client that the $3,000 fine you get slapped with as you're removed from the country and the 10-year bar on return is not part of how the removal order is implemented. So I think you can even rely on Mr. Yang's words here today to recognize that there is jurisdiction. Turning to the merits, the government's main argument is that there's a distinction between statutes and regulations governing primary conduct and statutes and regulations governing filings. I also don't know where that comes from. If you start with the regulation, section 1001.1, it says it applies to any action. The government tries to read that in a way that it only applies to regulatory deadlines and not statutory deadlines. What the government fails to grapple with is that many regulatory deadlines simply parrot statutory deadlines in Title VIII of the Code of Federal Regulations and in plenty of other regulatory schemes outside of immigration. We cite examples at page 42 of our brief where other agencies have adopted this same traditional principle. So at the end of the day, I think the question is what would somebody picking up this statute in 1996 have made of it? That person would have had the immigration regulation we've been talking about. They would have had Rule 6A, which both this court and the BIA have looked to to understand how deadlines work, not only where the rule directly applies, but also in other cases. That person would have had precedent from this court applying this traditional rule. That person would have had the common law principle that's applied even before that, and there is nothing cutting in the other direction, nothing that that person would have looked to in 1996 to think that there was a different definition, a different time calculation rule that applied to this statute and this statute only. We ask the court to reverse.